155 S.W.3d 575 (2004)
In the Matter of M.J.A.
No. 04-03-00076-CV.
Court of Appeals of Texas, San Antonio.
December 8, 2004.
*576 Michael D. Robbins, San Antonio, for appellant.
Alan E. Battaglia, Asst. Criminal Dist. Atty., San Antonio, for appellee.
Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice PAUL W. GREEN, Justice SARAH B. DUNCAN, Justice KAREN ANGELINI, Justice SANDEE BRYAN MARION, Justice PHYLIS J. SPEEDLIN, Justice.

OPINION ON THE STATE OF TEXAS'S MOTION FOR REHEARING EN BANC
Opinion by SANDEE BRYAN MARION, Justice.
In June 2002, M.A. was charged with the burglary of a neighbor's home. Before the case was tried, he was shot in a drive-by shooting. M.A. was hospitalized for approximately four weeks. His trial ultimately began in January 2003. However, after the first day of trial, M.A. entered an open plea of true, and his case proceeded to the disposition phase. In his sole issue on appeal, M.A. complains the trial court erred in placing him on probation outside his home. M.A. asserts that, instead, the trial court should have allowed him to remain in his mother's home. In an opinion and judgment dated May 26, 2004, we reversed the trial court's judgment and remanded the cause for further proceedings. The State filed a motion for rehearing en banc. We grant the motion, withdraw *577 our opinion and judgment of May 26, 2004, and issue this opinion and judgment in their place. We affirm.

DISCUSSION
The purpose of the Juvenile Justice Code is to provide for the care and protection of the juvenile, placing an emphasis on a program of treatment, training, and rehabilitation. See Tex. Fam.Code Ann. § 51.01(2)(C), (3) (Vernon 2002); In re D.Z., 869 S.W.2d 561, 566 (Tex.App.-Corpus Christi 1993, writ denied). However, that is not the only interest served by the juvenile code. The care and protection of the juvenile must be balanced against the welfare of the community and the protection of the public interest. See Tex. Fam.Code Ann. § 51.01(1), (4); In re T.D., 817 S.W.2d 771, 774-75 (Tex.App.-Houston [lst Dist.] 1991, writ denied). The code's goals should be achieved "in a family environment whenever possible, separating the child from the child's parents only when necessary for the child's welfare or in the interest of public safety." Tex. Fam.Code Ann. § 51.01(5). If the trial court orders the child removed from the home environment, it must state its reasons for doing so in its disposition order. See id. § 54.04(f). We review these reasons and "determine whether they are supported by the evidence and whether they are sufficient to justify the particular disposition ordered." In the re K.T., 107 S.W.3d 65, 68 (Tex.App.-San Antonio 2003, no pet.).

Placement Outside the Home
At the disposition hearing, the trial court heard testimony from several witnesses, including M.A.'s neighbors. The complainant and one of M.A.'s neighbors testified to the events of the day of the burglary. A second neighbor testified that on the day of the burglary he saw M.A. walking toward the complainant's apartment carrying a butcher knife with a nine-inch blade, and, on another day, he overheard M.A. and another resident discussing drugs. This neighbor characterized M.A. as someone who liked to associate with older men, and he said M.A. had a reputation as a burglar, vandal, and "peeping tom." A third neighbor said her own son, another boy, and M.A. were caught breaking lights in the apartment complex. When she came home from work, she found the boys in the backseat of a police car; her son crying, the other boy "delirious," and M.A. laughing. Her own apartment had been burglarized twice, and she suspected M.A. because she found him hiding in the bushes near her apartment. She said a neighbor told her M.A. tried to sell him some of the items stolen from her apartment. A fourth neighbor, Carol Tsami, testifying on M.A.'s behalf, said that M.A. had a reputation for burglary, fighting, "being rowdy," and associating with older males. However, Tsami thought M.A.'s behavior had improved significantly since he was shot. M.A.'s probation officer recommended one year probation in the home because M.A.'s grades were good, this was his first adjudication, and he had adequate supervision at home. He testified that M.A.'s mother had previously had him placed outside her home because she was concerned that M.A. socialized with older boys who led him into criminal activity. M.A. returned home one year later. The probation officer admitted he was not aware of M.A.'s reputation in his neighborhood for use of marijuana, carrying a butcher knife, or possession of pornographic magazines.
Leon Webster[1] testified that he also believed M.A.'s behavior improved after *578 the shooting, and Webster thought M.A. was now more willing to accept supervision. Webster testified that he spent more time with M.A. than M.A.'s mother because of her work hours. Although Webster may be commended on his efforts with M.A., he is, as M.A.'s mother's "significant other," under no obligation to continue those efforts. That obligation lies with M.A.'s mother, Ms. Teresa Allen. Ms. Allen believed M.A.'s behavior changed for the better after the shooting. Ms. Allen said M.A. denied his involvement in the burglary when she asked him about it shortly after he was charged. However, after the first day of trial and the night before the disposition hearing, M.A. told her "that he did go into that lady's house." It was not until the disposition hearing that Ms. Allen realized who "that lady" was; she apparently thought the complainant was another woman in the neighborhood. The State asked Ms. Allen, "Are you telling us for the last year he has not been honest with you about this?" She responded as follows:
I never knew, okay, up until it came up that he was going to be charged. I take that back. Rumors  the neighbors had been telling me some kids had been breaking in there, and they was not aware, you understand what I am saying, I didn't know [M.A.] was involved in all the breaking in and out. There is nothing in my house that shows that, like no new TV in my house, or a VCR or a microwave. ...
Ms. Allen admitted she did not know M.A. associated with older boys and men. When asked if M.A. was "more of a follower, [could] older children influence him," she responded, "To do whatsoever, whatever I guess, yes, that's where all his stuff originated from." Although Ms. Allen said she would ensure M.A. only associated with children his own age, she explained that her work schedule occasionally required her to be at work from 8:30 a.m. until midnight. Ms. Allen was asked:
Q. And you want [M.A.] to be open with you. Do you feel he is open with you?
A. To a degree, yes.
Q. Just not about the criminal activity?
A. Whether or not he is doing thing [sic] I don't approve of.
Q. And there could be more things, you don't know because he has not told you?
A. He doesn't have that much freedom. When these things were going on could be the time I was at work. So it is not like 24 hours of time where he can get into different types of things.
As to his association with J.T. Tsami,[2] the following exchange occurred:
Q. Ms. Allen, I would like to know how you feel about [M.A.] hanging out with J.T., who is 14 years old and we know for a fact is sexually active, and we know his mom has come in here today and said the reason he is sexually active is because of peer pressure. And we know he is charged with aggravated sexual assault. How do you feel about your son with a child like that?

*579 A. When him and J.T. is together, it is not a matter of him spending the night over at J.T.'s house or J.T. spending the night at my house. He never came to my house after dark.... If he comes over there they are usually going to play ball.
Q. You don't have any concerns about J.T. and your son hanging out?
A. Not as far as his charges, no.
...
Q. ... Do you not have concerns about these two boys who are so easily swayed hanging out together and committing very serious crimes?
A. No, because they don't hang out everyday. ....
The trial court also questioned Ms. Allen about what she was told by M.A. and about her ability to supervise M.A.:
Q. So is it your understanding [M.A.] was burglarizing this lady's home for Mike?
A. Maybe. You know, Judge Kelsey, I don't really know how it went.
Q. Slow down. This is your child and you love him and you are concerned about him, correct?
A. Yes.
Q. So if your child has done something wrong, and he is telling you he did something wrong, I know you asked him some questions?
A. Yes, I did.
Q. What did [M.A.] get for burglarizing this lady's house? What did he get? What did he get?
A. He didn't tell me anything.
Q. He didn't get any money?
A. He didn't tell me. I asked him what happened. He said  he just said they were going to burglarize the house. I said what happened to the stuff? I asked him that and he told me that Mike took it and gave it to somebody else. And they are not there anymore.
Q. That is not telling me nothing [sic].
A. You understand what I am saying? I am telling you what he told me.
Q. So he is still not forthcoming. He is not telling you everything. Is that right?
A. I guess.[3]
...
Q. The person who takes care and watches [M.A.] is Mr. Webster, right?
A. Most of the time.
Q. Because you are at work?
A. Yes.
Q. Basically [M.A.] is just doing his own thing, except for when he follows Mr. Webster's instructions. Is that correct?
A. He usually minds Leon. He is into computers a lot of the time. He can keep him in.
Q. Who is into computers?
A. Leon.
Q. I thought you were referring to [M.A.]?
A. Computer technician.
Q. The supervision of this young man is pretty much you rely on Mr. Webster to help you. You have to work long hours to make a living?
A. Sometimes, yes.
*580 Finally, the prosecutor asked Ms. Allen about her ability to supervise M.A.:
Q. Can you tell us just briefly how often [M.A] is left by himself where he is not in school and you are not around, and Mr. Webster is not around?
A. Rarely. If Leon cannot be with him, I would usually find a way. My mom will pick him up from school or I would take off an hour from work and take him. I don't normally leave him there by himself, not if I am at work or something like that. He has been at the house by himself if I went to the store, but it is never no long period of time.
Q. Can you explain if he is not being left alone how he could have committed this burglary?
A. No, I can't.
Based on this evidence, we hold that the State carried its burden of proof and the trial court did not abuse its discretion in finding that "[M.A.], in [his] home, [could not] be provided the quality of care and level of support and supervision that the child needs to meet the conditions of the probation." See Tex. Fam.Code Ann. § 54.04(c).

Care at Southton Facility
The dissent states that "resolution of this case centers upon... [1] whether the evidence supports the trial court's implicit conclusions that placement outside the home `is necessary for the child's welfare or in the interest of public safety" and, if so, [2] whether it will provide M.A. with "the care that should be provided by parents." See op. at 589. We agree with the first part of this statement because safety of the public is a primary concern of the Juvenile Justice Code. See In the Matter of J.P., 136 S.W.3d 629, 632 (Tex.2004) (noting that a "primary concern" of the Juvenile Justice Code is "the safety of the public"). However, we disagree with the second part of the dissent's statement because nothing in the Juvenile Justice Code requires the trial court to determine, or the State to prove, that the public or private institution or agency will provide a specific type of care, rehabilitation, or supervision. The dissent's conclusion that there is "... no evidence regarding the Southton facility or the care it provides ..." erroneously places a burden on the State that the code does not require.
Instead, under the code, a child may not be placed "on probation outside the child's home ... unless the court or jury finds that the child, in the child's home, cannot be provided the quality of care and level of support and supervision that the child needs to meet the conditions of the probation...." Tex. Fam.Code Ann. § 54.04(c) (Vernon Supp.2004) (emphasis added). If such a finding is made, "the court or jury may ... place the child on probation ... [in] a suitable public or private institution or agency, except the Texas Youth Commission." Id. at § 54.04(d)(1)(B)(ii). Therefore, the trial court here was authorized to place M.A. on probation outside his home if the court found that he would not receive the care and supervision in his home necessary to meet the conditions of his probation. As stated above, the record supports such a finding.

Public Safety and Welfare
The trial court also was required to consider the public's safety and welfare. See Tex. Fam.Code Ann. § 54.01(e)(4); see also In the Matter of J.P., 136 S.W.3d 629, 632. The dissent concedes there is "abundant evidence from which the trial court could have concluded that placement outside the home was necessary in the interest of public safety before [the shooting]." *581 See op. at 589 (emphasis in original).[4] The dissent also concedes there is evidence, albeit "very little" evidence, that M.A. posed a threat to public safety after the shooting. Id. at 589. The dissent describes the shooting as "pivotal" in understanding the testimony at trial. However, the importance of that event and its affect, if any, on M.A was for the trial court, and not this court, to decide because that decision necessarily involved an evaluation of credibility and demeanor. The trial court had the advantage of considering the factual sequence of events as outlined by the dissent. But, as evidenced by its reasoning set forth below, the trial court had to determine whether M.A. truly experienced a life-altering experience following the shooting or whether his conduct, his "reputation for taking advantage of friendly relationships for his own gain," and his mother's apparent inability to supervise him warranted placing M.A. on probation outside his home.
The trial court initially committed M.A. to the Texas Youth Commission, citing among its reasons a concern for the safety of the community. While informing M.A. of its disposition, the court referred to the shooting several times:
"The only thing that intervenes is you got shot and that slowed you down. Otherwise there is no telling what you would be before this Court for. Because you were running straight down the hill getting in trouble."
"In Mr. Echols' report there is mention this young man started having problems at age nine. He has been placed out of the home in the past and then the burglary, the breaking the street lights comes up, going down the alley with a butcher knife. All these problems, even with him being shot, when he recovers what says he is not going to go back to his old habits if he doesn't get the appropriate help?"
"... [M.A.], look, I am going to have to find there is a need for disposition and as for your rehabilitation. But I think more importantly for the protection of the community in which you were residing where several, and let me count them, at least four people from your neighborhood came in and testified about the problems they were having while you lived in the neighborhood, or were living in the neighborhood and miraculously everything calms down when you leave. And then you come back to the neighborhood but you are recuperating because you have been shot, not able to do anything. It is my opinion that you have been out of control for a while, sir. ...."
Later, on its own initiative, the court modified its disposition order and placed M.A. on probation outside his home and in the custody of the chief juvenile probation officer. Again, the court considered M.A.'s behavior before and after the shooting: "I believe the Texas Youth Commission is also appropriate, but because of your age, your physical condition being injured in the past, and to give you one opportunity to prove that you can do a good job, I am going to give you an opportunity to go to placement."
The trial court's decision not to commit M.A. to the Texas Youth Commission indicates the court placed some emphasis on the shooting and gave some weight to the testimony that M.A. had turned his life around. However, the trial court's decision *582 to place him on probation outside his home, rather than in his home, indicates the court did not discount  as the dissent does in its opinion  M.A.'s conduct before the shooting and his reputation in the neighborhood. It is apparent the trial court implicitly arrived at two conclusions. First, either not enough time had elapsed since the shooting to determine whether M.A. had truly changed his life or M.A. had not so completely changed his life since the shooting that he was no longer a threat to the public safety and welfare. Second, M.A.'s family environment remained unchanged since the shooting; thus, the purposes of the Juvenile Justice Code  "to provide for the protection of the public and public safety" and "to protect the welfare of the community and to control the commission of unlawful acts by children"  could not be achieved in his home environment.

CONCLUSION
Having determined that M.A. could not receive the appropriate level of care and supervision in his home and that he posed a threat to the safety and welfare of his community, the purposes of the Juvenile Justice Code were satisfied by the court's decision to place M.A. on probation outside his home. The court's reasoning indicates it considered and applied the code's purposes, and acted with reference to its guiding principles. Therefore, the trial court did not abuse its discretion in placing M.A. on probation outside his home. We overrule M.A.'s issue on appeal and affirm the trial court's judgment.
Dissenting opinion by SARAH B. DUNCAN, Justice, joined by PHYLIS J. SPEEDLIN, Justice.
SARAH B. DUNCAN, Justice, dissenting.
I respectfully dissent from the majority's judgment. In my view, when the evidence is viewed chronologically, it is clear the trial court abused its discretion in placing M.J.A. on probation outside, rather than within, his home. Accordingly, I would reverse the trial court's order and remand the cause for further proceedings consistent with this opinion.

FACTUAL AND PROCEDURAL BACKGROUND
In June 2002 M.A. was charged with the December 2001 burglary of the apartment of one of his neighbors, Linda Myles. Before the case could be tried, however, on July 23, 2002, M.A. was critically wounded when he investigated a drive-by shooting across the street from his grandparents' home. M.A. was in the intensive care unit for two weeks and in the hospital for another two weeks. After the shooting, M.A. underwent what one neighbor described as a "complete turnaround." Because the shooting appears to us to be so very pivotal in understanding the testimony at trial, I arrange my statement of the facts in its light. I do so with the clear understanding that my ability to arrange the facts in this manner is an organizational tool that derives from the written record and an advantage that was not available to the trial court.

Before the July 23, 2002 Shooting
M.A. was born October 9, 1988. According to his mother, Teresa Allen, M.A. has had virtually no relationship with his father, who has been in prison most of M.A.'s life. Allen, who begins her work day as a medical claims processor at 8:30 a.m. and sometimes does not finish until midnight, testified that M.A. had been in special education since first grade, when he was diagnosed with dyslexia; he has also been diagnosed as bipolar and ADHD (Attention Deficit Hyperactivity Disorder), for which he was prescribed various medications *583 over the years. None worked well. Allen's testimony was confirmed by her "significant other," Leon Webster, who has known M.A. and his mother since M.A. was six months old.[1] According to Webster, one or another of the prescribed medications made M.A. "too hyper," which was why he often would not sleep at night, and would go outside and bounce the basketball for ten or fifteen minutes so he could calm down enough to go to sleep. Ultimately, this inability to sleep caused M.A.'s doctor to allow him to discontinue use of the medication.
M.A.'s neighbors uniformly testified that, before the shooting, their neighborhood was plagued with vandalism; and M.A. was a known troublemaker. One neighbor, Dee Hodges, testified that, when M.A. was eleven or twelve, he, her son, and a younger child were caught breaking the glass in some lights in the neighborhood. When she saw them in the back of a police car, her son was hysterical, the younger child was delirious, and M.A. was laughing. Hodges also reported that her apartment had been burglarized twice and she suspected M.A. had done it. A neighbor told her after the second burglary that M.A. tried to sell him some of the items that had been stolen. Although Hodges reported the burglaries and the neighbor's statement to the police, "nothing came from it."
Another neighbor, Gloria Rupert, reported there were lots of eggs thrown "all over" and specifically at her window. Rupert also testified that her new bicycle had been stolen, the chain on a neighbor's bicycle was cut, and someone on the other side of the apartment complex said "someone broke into this house." Rupert testified that, in 2002, someone had thrown rocks at her; she did not see M.A., however. Rupert also testified that M.A. dresses "differently," "[u]sually has shades on"; "[h]is hair was blond [or long] at one time, braided and things on the head."
Another neighbor, Bob Opiela, was also aware of vandalism at the apartment complex  eggs thrown at Rupert's apartment and the theft of her bicycle, dents in a resident's car, break-ins at empty apartments, and stolen appliances warehoused in an empty apartment. But Opiela admitted that no one could say that M.A. was doing these things. Opiela did testify regarding a specific event within his personal knowledge. One Sunday afternoon Opiela saw a resident from the back apartment ask M.A. if he had any drugs on him.[2] M.A. responded that he did not and explained why. When Webster came out and demanded that M.A. return to the apartment, M.A. "basically told him `I am busy, leave me alone,' and Webster said `okay.'" As far as Opiela knows, however, M.A. is not a drug dealer; he did not see an exchange of drugs that Sunday afternoon or at any other time; and he does not think he has ever seen M.A. when Opiela could tell he was on drugs. Opiela also testified that before M.A. was shot, he often saw M.A. outside around 10:30 at night by himself bouncing his basketball in *584 the parking lot; Opiela would tell M.A. to go inside.
There was also a great deal of testimony regarding a car that burned to the ground in front of M.A.'s duplex during the early summer of 2002. According to Webster, the car was owned by their next door neighbor, a much younger woman who was involved with another woman's boyfriend or husband. Someone knocked on M.A.'s door and alerted Webster to the fire. Webster, concerned because the burning car was parked next to Allen's car, went outside to move Allen's car out of the way. Webster later went from door to door trying to find and thank the person who had woken them up and alerted them to the situation. Webster's version of the car burning thus comports with that of Rupert and Opiela, who was told by Rupert that it was a girlfriend who burned another girlfriend's car. Opiela does not know if M.A. set the car on fire; but, as far as Opiela knows, M.A.'s family had nothing to do with the incident.
Another neighbor who testified was Carol Tsami. Tsami had not been subpoenaed to testify but was in the courthouse on her son J.T.'s as yet unadjudicated aggravated sexual assault case.[3] When Tsami realized M.A.'s case was being tried, she volunteered to testify. According to Tsami, before M.A. was shot, he "was being pretty rowdy, and fighting, and breaking in places and stuff like that." In Tsami's opinion, M.A. got in trouble because he was hanging around with older kids, who were manipulating him. When Tsami related her belief to Allen, Allen said she would tell M.A. that he could not go out; but he would do so anyway. Ultimately, M.A.'s associations with older men caused Tsami to instruct her son J.T. that he was not permitted to associate with M.A.
Opiela also testified that he would often see M.A. in the company of much older men (early to late twenties), whom Opiela thinks "were up to no good" because of the looks they gave him. According to Opiela, M.A. has "a reputation for taking advantage of friendly relationships for his own gain," because his neighbor Dee Hodges believes that M.A. used his friendship with her son Kyle as a means of getting into their house and then taking things. Opiela also opined that M.A.'s reputation in the neighborhood is "pretty poor"; "[h]e has a reputation for being a peeping Tom,[4] for vandalism," and "for burglary." When asked if she knew about M.A. being a vandal or a peeping Tom or carrying a knife, Tsami testified that, "[s]ometimes if you do something wrong and you have a police record, all of a sudden in a little area you are living in, ... it gets around that everybody wants to throw the bad apple to the same kid all the time"; Tsami believes that is what is happening to M.A. and it is not fair.

The December 29, 2001 Burglary
The burglary occurred on December 29, 2001. The complainant, Linda Myles, testified that a smooth round hole was cut out of a back window in the apartment in which she had been living with her four-year-old daughter since October 2001. The burglars took two televisions, a microwave, and a VCR. She had planned to sell the microwave and the smaller television *585 to help pay some bills. After the burglary, her daughter had "a lot of nightmares"; and Myles was nervous about walking around the area and felt "unhappy about not being there at night to know the house was okay."
Gloria Rupert, one of M.A.'s neighbors, testified that, around 3:00 p.m. on December 29, 2001, she saw M.A. and another boy (later identified as Mike) walk across the parking lot towards Myles' apartment. She saw the two boys go behind the buildings, heard Myles' voice and the sound of her door, and presumed the young men went into Myles' apartment. When Rupert saw the boys come out, she went inside her apartment to get ready for work. When she came out, she noticed Mike looking over his shoulder toward the fence behind the building; he appeared to be looking for someone. She then saw M.A. running behind the building towards his apartment and carrying a large object under a light-colored cloth. Rupert looked up from her bike and saw that Mike had disappeared. Rupert then went to work. When she returned home that evening, she told her neighbor, Bob Opiela, what she had seen. Rupert had a message on her answering machine from Myles, who was very upset; Myles asked Rupert to keep an eye on Myles' apartment, because she had been burglarized around 3:00 p.m., was afraid to go home, and would be staying at a friend's house.
Bob Opiela lived in the building adjacent to Myles. At some point between 11:00 a.m. and 3:00 p.m., probably around noon, on the day of the burglary, Opiela saw M.A. walking through the alley behind his apartment in the direction of Myles' apartment with a knife; the blade on the knife was approximately nine inches long and approximately one and one-half to two inches wide. M.A. looked angry and walked stiffly. Opiela did not call the police because he saw no reason to do so; M.A. did not threaten anyone with the knife and, as far as Opiela knows, did not stab anyone or commit any vandalism with the knife.
M.A.'s neighbors agreed that, right before M.A. was shot, the vandalism in their apartment complex died down.

The July 23, 2002 Shooting
The shooting occurred when M.A. was at his grandparents' home. Allen's older son Tony, who is twenty-six, was across the street with some friends when two boys drove up and started arguing with another boy about a necklace. When Tony went outside to investigate, he was shot. Shortly thereafter, when M.A. crossed the street to investigate, he was also shot; he was later airlifted to BAMC and Wilford Hall.

After the July 23, 2002 Shooting
After the July 23, 2002 shooting, M.A. was in the intensive care unit for two weeks and in the hospital for another two weeks. M.A. recuperated at his grandparents' home and then returned to his mother's house, where he was living at the time of trial. After two continuances occasioned by M.A.'s injuries, the trial was ultimately reset for January 14, 2003. Initially, M.A. pleaded "not true." The evening after the first day of trial, however, M.A. confessed to his mother that he had entered Myles' apartment and that his friend Mike, who had also participated in the burglary, had taken the stolen property and given it to someone else. Neither Webster nor Allen has found any stolen merchandise or proceeds in their home. On the second day of trial, M.A. entered an open plea of true.
According to Allen, M.A. has done a lot of growing up in the last couple of years. He is no longer hanging out with older boys; he is happier with himself and *586 school, where, Webster testified, all his grades were in the 90s and where he has worked very hard to be able to transition to a regular junior high school, as he was scheduled to do the week of trial. In Webster's view, it would be a shame for the efforts of him and M.A.'s mother and grandmother to go down the drain. M.A. has also been lifting weights with Webster to rehabilitate his injured leg; in Webster's opinion, this exercise has the added advantage that it "helps M.A. calm down at night." To lock M.A. up would interrupt his progress. Allen agreed. She testified that M.A. is usually obedient and respectful. She has been trying to find him more to do inside, like listening to his stereo, and plans to get him a Playstation 2. She and Webster believe they can adequately supervise M.A. now. In the view of Webster, who actually spends more time with M.A. now than Allen does because of her work hours, this is in some part due to the fact that M.A. is more willing now to comply with being supervised. Neither Allen nor Webster attempted to paint M.A. as a perfect child. Allen admitted that M.A. does not have that much freedom and is rarely left by himself; but sometimes, when M.A. has been confined to the house, he has climbed out the balcony. And Webster admitted that, in searching M.A.'s room for drugs, which he has never found, he did find some Playboy magazines, which Webster made M.A. throw in the dumpster. Webster believes probation at home would be better, because M.A. needs to learn to make decisions and develop self control.
As to the events at the complex after the shooting, Myles testified she had no problems after the burglary in December 2001 until she moved out of the complex in September 2002. Neither Hodges nor Rupert have heard of any further neighborhood vandalism; and Opiela had not seen M.A. hanging out with older men. However, M.A. has been giving Opiela "bad looks" and being disrespectful by not saying "hello" and instead turning away when Opiela greets him. Opiela has not said anything to Allen or Webster; but he has been meaning to say something about it to M.A.
Rupert testified that M.A. has been "running around in [the] parking lot" with three or four other kids at 8:00 or 8:30 p.m. A couple of days before trial commenced, Rupert was coming home from work on her motorcycle when M.A. pushed a friend of his "towards [Rupert's] motorcycle." After M.A.'s friend said "excuse me," Rupert told M.A. never to do that again; and M.A. said "excuse me." She has had no other recent problems with M.A.
Hodges testified that since M.A. was shot, she has not seen him doing the things he used to do. Based on what she has seen and on what her son, who Hodges says is more observant, has told her, it is her "honest opinion" that M.A. has changed.
Tsami believes M.A. is a good child. During the last year, she and her son J.T. have seen an improvement in M.A.'s behavior. J.T. has said M.A. has completely changed; he does not fight, even when provoked, or even cuss. Tsami believes M.A. has done "a complete turnaround," "wanting to do good in everything." In Tsami's opinion, M.A. does not hang around older kids anymore. M.A. has been very respectful to Tsami. She believes M.A. should be given probation "because [of] how he has turned around." Tsami believes that if M.A. were "locked up it would be worse on him and it would not be good at all." Tsami has not seen M.A.'s mother in a long time but sees Webster twice a week. In her opinion, M.A. is not a ringleader but a follower; he *587 does not sit around thinking of ways to get in trouble.

Recommendations
The State recommended probation outside the home, while M.A. argued in favor of probation at home. M.A.'s argument was supported by his probation officer, Darren Echols.
Echols testified that he first received M.A.'s case in February 2001, almost two years before the disposition hearing, when M.A. was referred for unauthorized use of his mother's car  a charge that was rejected by the district attorney. During this two-year period, Echols had met with M.A. while he was in detention on the unauthorized use of a vehicle charge a number of times; he visited with M.A., his mother, and Webster at Echols' office four or five times; Echols had been to their home; and he had spoken with M.A.'s grandparents. Based upon this extensive contact with M.A. and his family, Echols recommended that M.A. "be placed on probation for a period of 12 months, with the first two months being on maximum supervision where he will report to [Echols] on a weekly basis." Echols made this recommendation because this was M.A.'s first adjudication; he had never been placed on probation or received a deferred prosecution agreement; his recent school performance had been excellent, so good in fact that he had made all As and was being transitioned from the Adolescent Intervention Center to Kruger Middle School, which is only done when a student is successful; he has no truancy record at the Adolescent Intervention Center and the Center staff speaks favorably of him; and M.A.'s mother and Webster "are providing ... good parental supervision." Although Echols was aware of a September 2001 CHINS (Child In Need of Supervision) report in which M.A. used inappropriate language at the Adolescent Intervention Center, he did not deem that charge worthy of changing his recommendation. He was also aware that, according to M.A.'s mother, M.A. had experimented with marijuana when he was about ten years old; however, Echols testified there is no report of any current drug usage. Echols believes his recommendation should be "based upon factual information;" therefore, while he would take the gossip and hearsay regarding M.A.'s "reputation... for being a peeping Tom, burglar, and fighting, and being rowdy" into consideration, it would not alter his recommendation. As Echols testified:
[M]y recommendation is based on [M.A.] and how he is as of this date. As a probation officer my recommendation is to modify behavior so that he will not be referred to our department again. Most of these incidents took place December of 2001. This young man has shown considerable improvement since then. And whatever form of intervention that I recommend is suppose[d] to be the least restrictive intervention that is available. I don't believe taking this young man out of his house would be beneficial to him. Where he is at right now he has made considerable progress. And I believe he will be successful on probation with his parents, his mother and Mr. Webster's support.

Trial Court Action
Initially the trial court committed M.A. to the Texas Youth Commission; later, on its own initiative, the court modified its disposition order and placed M.A. on probation outside his home at Southton Placement Facility, for six to nine months until graduation, and on regular probation in the care of the chief probation officer for three years. In its disposition order, the court made the findings required by section 54.04(i)(1) of the Texas Family Code *588 but did not "state specifically" the reasons for its disposition, as required by section 54.04(f) of the Texas Family Code. Tex. Fam.Code Ann. § 54.04(f) (Vernon Supp.2003); see In re K.T., 107 S.W.3d 65, 68 (Tex.App.-San Antonio 2003, no pet.) (discussing the section 54.04(f) and section 54.04(i)(1) findings); id. at 70 (in the absence of a section 54.04(f) statement of reasons, court looks to trial court's statements at disposition hearing). I therefore resort to the following statements made by the trial court at the disposition hearing:
The Court is reopening the Matter of [M.A.] [M.A.], I need to also tell you that the reason, the specific reasons, for my decision for granting you placement and modifying my decision, is that there was a lot of information given to the Court that I felt to be inappropriate to place you on probation at the time. I believe the Texas Youth Commission is also appropriate, but because of your age, your physical condition in being injured in the past, and to give you one opportunity to prove that you can do a good job, I am going to give you an opportunity to go to placement.
And the information the Court had about you being inappropriate at home included things such as being a peeping Tom, having older friends, being drug involved, outside late at night, and most importantly disrespectful to adults, poor reputation in your neighborhood, vandalism in the neighborhood. Your mother has to work long hours. You seem to be disrespectful to your mother's boyfriend when you were under his supervision. You do not follow your mother's instructions. Reputation for stealing from other people. Information given to the Court that you know how to sneak out of the house. Pushing another child in front of a motorcycle.
As I read this it makes me want to go backward.
I am finding the child in the child's home cannot be provided the quality of care and level of support and supervision the child needs to meet the conditions of probation. So those are my specific reasons and I needed to put that on the record.

STANDARD OF REVIEW
As we recently held in our en banc decision in K.T., we review a trial court's disposition order under the criminal abuse of discretion standard divorced from legal and factual sufficiency. See In re K.T., 107 S.W.3d 65, 74 (Tex.App.-San Antonio 2003, no pet.). Under the criminal abuse of discretion standard, we "`view the evidence in the light most favorable to the trial court's ruling,' affording almost total deference to findings of historical fact supported by the record." Id. at 75 (quoting Guzman v. State, 955 S.W.2d 85, 89 (Tex.Crim.App.1997)). "However, when the resolution of the factual issue does not turn upon an evaluation of credibility or demeanor, we review the trial court's determination of the applicable law, as well as its application of the appropriate law to the facts it has found, de novo." In re K.T., 107 S.W.3d at 75.
We adopted the abuse of discretion standard in part because it promised to afford "meaningful appellate review" of disposition orders and enable "the applicable legal rules [to] acquir[e] content through application" to "ensure [ ] that the appellate courts will ... maintain control of [and] clarify the legal principles involved." See id. at 74. And we did so despite the concurring justices' view that the abuse of discretion standard is inappropriate because "`the trial court is not applying a set legal standard to the facts.'" Id. As we explained in response, "the courts in other jurisdictions have derived the standard *589 from the legislatively-expressed purposes of the state's juvenile system and held the ultimate legal question in reviewing a disposition order is whether, under an abuse of discretion standard, the trial court's disposition conforms to `the purposes of the Juvenile Court Law.'" Id. (quoting In re Michael R., 73 Cal.App.3d 327, 140 Cal.Rptr. 716, 720 (1977)). We predicted that, "when an appropriate case is presented, a similar approach will yield the standard for reviewing disposition orders in Texas." Id. (citing Tex. Fam.Code Ann. § 51.01 (Vernon 2002)). The "appropriate case" we envisioned in K.T. is this case.

DISCUSSION
The purposes of Texas' Juvenile Justice Code are expressly set forth as follows:
This title shall be construed to effectuate the following public purposes:
(1) to provide for the protection of the public and public safety;
(2) consistent with the protection of the public and public safety:
(A) to promote the concept of punishment for criminal acts;
(B) to remove, where appropriate, the taint of criminality from children committing certain unlawful acts; and
(C) to provide treatment, training, and rehabilitation that emphasizes the accountability and responsibility of both the parent and the child for the child's conduct;
(3) to provide for the care, the protection, and the wholesome moral, mental, and physical development of children coming within its provisions;
(4) to protect the welfare of the community and to control the commission of unlawful acts by children;
(5) to achieve the foregoing purposes in a family environment whenever possible, separating the child from the child's parents only when necessary for the child's welfare or in the interest of public safety and when a child is removed from the child's family, to give the child the care that should be provided by parents....
Tex. Fam.Code Ann. § 51.01 (Vernon 2002). The resolution of this case centers upon sections 51.01(1), (4), and (5) and whether the evidence supports the trial court's implicit conclusions that placement outside the home is "necessary for the child's welfare or in the interest of public safety" and, if so, whether it will provide M.A. with "the care that should be provided by parents."

Public Safety
As set forth in the statement of facts above, the record contains abundant evidence  albeit the rankest hearsay and indeed gossip  from which the trial court could have concluded that placement outside the home was necessary in the interest of public safety before M.A. was shot in July 2002. But there is very little evidence that M.A. posed a threat to public safety after the shooting, at the only relevant time  the disposition hearing. There was evidence that M.A. had a few Playboy magazines, plays in the parking lot with three or four friends at 8:30 p.m., and pushed his friend towards Rupert's motorcycle. Possessing a few Playboy magazines and playing in the parking lot with several friends do not threaten the public safety. Pushing another child towards a motorcycle is another matter. But I deem it significant that M.A. pushed one of his friends  not an elderly person and not a baby. And the incident did not occur on a public street but in the parking lot of the apartment complex where both boys lived. Under these circumstances, I conclude the trial court abused its discretion in concluding that, at the time of the disposition *590 hearing, placement outside the home is necessary in the interest of public safety.

Care
I now turn to the evidence supporting the trial court's conclusion that placement outside the home will provide M.A. with the care that should be provided by parents. Quite simply, there is none  no evidence regarding the Southton facility or the care it provides and, in particular, no evidence that it will be able to transition M.A. into the regular school environment, which he has worked so hard to achieve while living at home, and no evidence that Southton will assume the responsibility that Webster has been discharging to ensure that M.A. continues the physical therapy necessary to his rehabilitation. Under these circumstances, I conclude that the trial court abused its discretion in implicitly concluding that placement at Southton will provide M.A. with the care that should be provided by parents. I reach this conclusion with full recognition that M.A.'s life at home is imperfect; Allen must work long hours, M.A.'s biological father is in prison, and Webster's relationship with Allen has been something less than a model of stability. But the trial court  and we  must balance this less than perfect home life against the Legislature's direction that, if a child is to be removed from his home, he must be placed in a facility that will "give the child the care that should be provided by parents." On the record before us, there is simply no evidence that Southton will provide M.A. with even the level of care provided by Allen and Webster.

CONCLUSION
Because there is no record evidence to support the trial court's implicit conclusions that placement at Southton is "necessary for [M.A.]'s welfare or in the interest of public safety" and that Southton will provide M.A. with "the care that should be provided by parents," I would reverse the trial court's judgment and remand the cause for further proceedings consistent with this opinion.
NOTES
[1] Although Webster testified he has known M.A. since M.A. was a baby, Webster has not played a constant role in M.A.'s life. Webster and M.A.'s mother are currently living together; however, Webster has moved in and out of M.A.'s mother's home over the years. Nothing indicates an obligation on his part to remain in M.A.'s home or a part of his life.
[2] J.T., who is Carol Tsami's fourteen-year-old son, was charged with aggravated sexual assault. At the time of M.A.'s disposition hearing, J.T.'s case was unajudicated.
[3] The conversation between M.A. and his mother occurred almost six months after the shooting allegedly changed M.A.'s life.
[4] The dissent characterizes this evidence as "the rankest hearsay and gossip." No objections were raised to any testimony as being "hearsay" and it was the prerogative of the fact-finder, here the trial court, to determine what testimony was mere gossip and the weight to be given any such gossip.
[1] When M.A. was about eighteen months old, Webster moved to Houston; he returned in 1998. He first moved in with M.A.'s mother in January 2000; they separated in October 2001 and then got back together in January or February 2002. Allen and Webster hit another "bump in the road" from August until November 2002, when he started living with M.A. and his mother again.
[2] I have placed this testimony in the pre-shooting events because M.A.'s inability to stand for long periods of time after the shooting was evident to the trial judge at trial. ("We need to have the Respondent have a seat. His leg is hurting him.")
[3] Tsami's fourteen-year-old son was charged with aggravated sexual assault, which she believes is unjust because she believes he was sexually assaulted by an eighteen-year-old; in Tsami's opinion, the girl was seventeen at the time and consented to it.
[4] Other than this statement of Opiela's opinion of M.A.'s reputation, there was no evidence  direct, hearsay, or circumstantial  that M.A. engaged in any conduct that could be characterized as "being a peeping Tom."